UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PAULA M. SCHMIDT,

       Plaintiff,                               Civil Action No. 08-12378

v.                                      HON. JULIAN ABELE COOK
                                         U.S. District Judge
                                         HON. R. STEVEN WHALEN

COMMISSIONER OF SOCIAL           U.S. Magistrate Judge
SECURITY,

       Defendant.
_____/

## REPORT AND RECOMMENDATION

Plaintiff Paula Schmidt brings this action under 42 U.S.C. §405(g) challenging a final decision of Defendant Commissioner denying her application for Disability Insurance Benefits under the Social Security Act. Both parties have filed summary judgment motions which have been referred for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B). I recommend that Defendant's Motion for Summary Judgment be DENIED and Plaintiff's Motion for Summary Judgment GRANTED, remanding this case for further administrative proceedings pursuant to sentence four of § 405(g), with instructions to consider new material presented to the Appeals Council and to this Court.

## PROCEDURAL HISTORY

On February 12, 2004, Plaintiff filed a protective application for a period of disability and Disability Insurance Benefits ("DIB"), alleging an onset date of April 24, 1994 (Tr. 57,

74).  After the initial denial of the claim, Plaintiff timely requested an administrative hearing, held on April 27, 2007 in Oak Park, Michigan with Administrative Law Judge ("ALJ") Anthony B. Roshak presiding (Tr. 372).  Plaintiff, represented by attorney Michael Jaffe, testified, as did vocational expert ("VE") Elaine Tripi (Tr. 374-387, 388-389).  On June 21, 2007, ALJ Roshak, finding that although the Plaintiff met the special earnings requirement from the period of April 24, 1994 through June 30, 1994, his impairments could not have been expected to result in death or preclude her from engaging in any substantial gain gainful activity for a continuous period of not less than 12 months (Tr. 32-33).  On April 16, 2008, the Appeals Council denied review (Tr. 5-7).  Plaintiff filed for judicial review in this Court on June 4, 2008.

## BACKGROUND FACTS

Plaintiff, born on September 27, 1972, was 34 at the time of the administrative decision.  (Tr. 30, 57).  She graduated from high school and completed two years of college, working previously as a daycare worker and providing customer service in a bridal boutique (Tr. 69, 71, 338).  Plaintiff was injured in a motor vehicle accident on April 24, 1994 (Tr. 31).  Her DIB application alleges disability as a result of closed head injuries, headaches, brain surgeries, extreme abdominal pain, broken legs, depression, and anxiety (Tr. 63-64).

### A.     Plaintiff's Testimony

Plaintiff testified that she resided with her parents and was employed as a part-time sales representative in her mother's bridal salon prior to the accident (Tr. 376-378).  She reported that until the accident, she had been attending school full time, but was unable to

recall the number of ongoing classes or credits (Tr. 377-378).

The ALJ limited questions to the four month period following the accident, April 24, 1994 to September 30, 1994 (Tr. 379). When questioned by her attorney, Plaintiff stated that she suffered from a leg and head injury, was unable to walk, and had sharp stomach pains and nausea (Tr. 381-382). After being released from the hospital in August, Plaintiff reported being completely bedridden requiring assistance from nurses and nurse aides to bathe, use the lavatory and eat (Tr. 383-384). She testified that she continued to suffer from extreme nausea and was in a lot of pain, but was unable to remember having headaches or problems with depression during that four month period (Tr. 384-385).

In response to the ALJ's questions, Plaintiff stated that she worked at a day care facility when she was in high school (Tr. 385). She testified that she assisted in sales and ordering inventory when helping her mother at the bridal salon (Tr. 386). Plaintiff reported that the last time she worked was prior to the accident, noting that she was currently supported by her parents, with no other source of income (Tr. 387). She concluded by stating that she was unable to remember if there was any kind of a lawsuit regarding the accident (Tr. 387).

### B. Medical Evidence

### 1. Treating Sources

### a. Immediately Following the Accident

On April 24, 1994, Plaintiff was brought to St. Joseph Hospital in Mount Clemens, Michigan by an ambulance after a motor vehicle accident and diagnosed with comminuted intra-articular fracture right distal femur, displaced fracture medial tibial plateau, avulsion fracture lateral tibital plateau, and hydrocephalus (Tr. 127, 128).[1] Plaintiff was evaluated by Dr. Mazhari, who determined that the hydrocephalus predated the accident and did not require surgical intervention at the time, but had the possibility of requiring a shunt in the future (Tr. 127). The treating notes indicated a risk of decompensation, evidenced by her loss of consciousness for about 20 minutes due to a head injury, and the insertion of an "ICP monitor" to observe her intracranial pressure during her leg surgery (Tr. 129). The surgical notes stated that A. Simaka, M.D., inserted screws and a metal plate in Plaintiff's right leg (Tr. 131-133). Radiology notes from April 24, 25, and 27, 1994 note evidence of "marked hydrocephalus" but report no hemorrhaging (Tr. 136, 139, 141). On February 20, 1996, Plaintiff underwent a successful operation to remove the metal plate previously inserted in the right femur (Tr. 154-156).

**b.      Hydrocephalus and Shunt Placement**

In July 1994, Alexia Canady, M.D., opined that Plaintiff was "symptomatic and was progressive symptomatic prior to the accident," based on "progressive difficulties with

---

[1]Hydrocephalus is an abnormal increase in the amount of cerebrospinal fluid within the cranial cavity that is accompanied by expansion of the cerebral ventricles, enlargement of the skull and especially the forehead, and atrophy of the brain. *See* Medlineplus medical dictionary, *available at* http://www.nlm.nih.gov/medlineplus/mplusdictionary.html

-4-

balance," and recommended inserting a shunt (Tr. 238). In September 1994, Plaintiff underwent surgery for decompression of a Chiari malformation in an attempt to resolve the hydrocephalus (Tr. 226, 234-237).[2] Treating notes by Dr. Canady from September 26, 1994, indicated that Plaintiff had "hydrocephalus with Chiari malformation" and that it was "probably not related to her accident," but found it "difficult to say" whether the accident exacerbated the condition (Tr. 233). After being discharged, Plaintiff required eight hours of health care assistance per day (Tr. 232).

In February 1995, Plaintiff underwent placement of a peritoneal shunt due to "significant hydrocephalus" (Tr. 228-230).[3] Treating notes from that period note that Plaintiff's hydrocephalus "probably preceded" the accident, but Plaintiff had "increasing symptomatology" leading up to the shunt placement (Tr. 228). On December 28, 1995, Dr. Canady reiterated her earlier assessment that it was "almost certain that [Plaintiff] had hydrocephalus prior to the accident," but her symptoms "may well have been" exacerbated as a result of the accident (Tr. 226-227).

Treating notes in April 1997 state that Plaintiff was hospitalized in February and March 1997 due to shunt malfunctions, which interfered with her ability to function "at her normal level" and made her unavailable for therapies or school (Tr. 221). Subsequent notes

---

[2]Chiari malformations (CMs) are structural defects in the cerebellum, the part of the brain that controls balance. *See* NINDS Chiari Malformation Information Page, *available at* http://www.ninds.nih.gov/disorders/chiari/chiari.htm

[3]A peritoneal shunt diverts excess cerebral spinal fluid to the abdomen.

report that Plaintiff was again hospitalized for a shunt malfunction, "complicated by biochemical pancreatitis," from April to May 1997 (Tr. 157-158). On April 18, 1997, Dr. Canady operated to fix the malfunction (Tr. 204, 211). On April 20, 1997, Dr. Canady performed a second operation to convert the peritoneal shunt to a ventricular atrial shunt because of Plaintiff's continued complications with the abdominal shunt (Tr. 222).[4] Treating notes during that period indicated Plaintiff complained of "increased headache," nausea, and abdominal pain on various occasions (Tr. 167, 174, 177, 191).

On August 11, 1997, Dr. Canady performed Plaintiff's follow-up examination, noting that Plaintiff had sustained "significant orthopedic injuries" from the accident in 1994 and was "on bed rest for 1 1/2 years" (Tr. 219). The note further stated that Plaintiff had complained about a "lightening like pain" in her head, that Dr. Canady was unable to reproduce; shoulder pain; occasional headache; some nausea; and significant knee pain (Tr. 219). Dr. Canady added that Plaintiff "is clearly improving," although "still very skinny" (Tr. 219, 220).

Treatment notes from November 2000 indicate Plaintiff was stable, but noted that she continued to have significant abdominal pain, while her headache was becoming less of a problem (Tr. 217).

c.    **Rehabilitation Treatment**

June 1997 treating notes from Sherry Viola, M.D., indicate that Plaintiff began a

---

[4]A ventricular atrial shunt diverts excess cerebral spinal fluid to the atrium of the heart.

-6-

rehabilitation program, attempted to take some college classes on a part time basis, and went to her mother's bridal store, "but really doesn't have the endurance to do any sort of work" (Tr. 267). The notes further indicated that Plaintiff "looks quite pale and fatigue[d]" at 12:30 p.m. and that she "doesn't have the strength or endurance to return to school at this time." (Tr. 267). Subsequent evaluation notes indicate Plaintiff had ongoing problems with pain in her right leg (Tr. 255-266).

The January 1998 notes indicate that Plaintiff "did very well" with the classes taken and was enrolled in three more in the upcoming semester, however she felt "overwhelmed, frustrated, and confused" at the bridal store when there was a lot of activity and was also afraid to drive (Tr. 263). Treating notes from May 1998 indicated Plaintiff had not begun physical therapy and that she exhibited depression (Tr. 261). Subsequent notes report some suicidal ideation and ongoing depression (Tr. 255-259). Plaintiff refused to be hospitalized for treatment, and was prescribed Paxil and Trazodone. She only met with a supportive counselor once in 1998 (Tr. 256-261).

Treating notes from June 5, 2002 report that Plaintiff complained about pain in her right leg and was "severely depressed and need[ed] psychiatric intervention," but had not seen a psychiatrist (Tr. 256). The note further stated that she does not drive and has worked, as able, at her mother's bridal shop (Tr. 256). Dr. Viola reported Plaintiff had no suicidal ideation, but did "not feel like she has much to live for" (Tr. 256). The August 2002 treating notes indicated that Plaintiff still had not been to a psychiatrist and that she complained about "unbelievable" pain in her right knee (Tr. 255).

   **d.      Psychiatric Counseling**

   In a psychiatric evaluation with Gilbert Ladd, M.D., on January 29, 2003, Plaintiff

reported that the April 1994 motor vehicle accident was caused by a drunk driver that crossed

the center line and "ran another car into her head on" (Tr. 330).   Plaintiff stated she was

wearing a seat belt, but the car had no air bag (Tr. 330).   Dr. Ladd diagnosed Plaintiff with

"traumatic brain injury ; depression" and "post-traumatic stress d/o" with a GAF of 52 (Tr.

331).[5]

   Subsequent treating notes through 2004 indicated Plaintiff had irregular sleep patterns

and complications with various medications used to treat depression, causing stomach

cramps, nausea, and bloating (Tr. 322-328).   An October 2004 letter from Dr. Ladd to State

Farm Insurance indicated that Plaintiff's "traumatic brain injury with depression and PTSD"

resulted from the April 1994 motor vehicle accident (Tr. 321).   A January 11, 2005 letter to

the Disability Determination Service indicated that Plaintiff's sessions for the past year were

conducted over the phone due to  her severe depression, anxiety, and agoraphobia resulting

from traumatic brain injury incurred during the 1994 accident (Tr. 317).   Dr. Ladd further

reported that Plaintiff "failed multiple med[ications]," was suicidal, and "certainly unable to

work in any capacity" (Tr. 317).

   Treating notes in April 2005 indicated Plaintiff started driver's training, but was still

───────────────

   [5]A GAF score of 51-60 indicates moderate symptoms OR moderate difficulty in
social, occupational, or school functioning.  American Psychiatric Association,
*Diagnostic and Statistical Manual of Mental Disorders--Text Revision* at 34 (*DSM-IV-
TR*)(4th ed. 2000).

exhibiting irregular sleep (Tr. 254). In February 2006, Plaintiff indicated she was still afraid of driving and was "taking some classes...majoring in psychology" (Tr. 353). In June 2006, while Plaintiff completed two classes, she began exhibiting "OCD features" in addition to her previous diagnosis (Tr. 351). On November 28, 2006, Plaintiff indicated having problems with her memory (Tr. 349). Treating notes in January 2007 indicate that Plaintiff's dog died and Plaintiff was crying daily (Tr. 348). Plaintiff was prescribed Valium and Anafranil (Tr. 347).

### e.   Abdominal Pain

Treating notes in October 1998 report Plaintiff "started to have chronic abdominal pains and symptoms approximately two years ago" (Tr. 300). Plaintiff was given Demerol injections, found not to have gallbladder dyskinisia, and diagnosed with "Hx of CHI ; VP Shunt" and "gastritis" (Tr. 295, 301). Subsequent notes in June 1999 report persistent abdominal pain with "[c]auses to be determined" (Tr. 292). Further treating notes in 1999, 2000, 2003, and 2004 indicate that Plaintiff continued to have abdominal pains (Tr. 274, 277, 286, 287). In July 2005, Isabelle Audet, M.D., noted that Plaintiff "has suffered from chronic pain since she had the shunt placed in her abdominal cavity" (Tr. 341). Treating notes from July 2006 and January 2007 state that Plaintiff's condition was "[l]ikely irritable bowel syndrom" (Tr. 345, 346).

### 2.   Non-treating Sources

A March 14, 2005, Psychiatric Review Technique conducted by Charles Overbey, M.D., found insufficient evidence of a medical disposition (Tr. 112). Plaintiff's file did not

contain either a physical or mental consultive examination on behalf of the SSA.

### 3.    Material Submitted After the June 21, 2007 Administrative Decision

A November 1995 letter from C. Pontillo, Dr. Simaka's office manager, reported that Plaintiff "was unable to ambulate without assistance until October of 1995" and had "around the clock" assistance due to her injuries, which was reduced in November to "about 4 hours per day" (Tr. 371). A October 2007 letter from Steven Ham, D.O., indicated that he and Dr. Canady cared for Plaintiff following the 1994 accident and in April, May, and June Plaintiff "was unable to walk and had severe impairment" (Tr. 370). A January 2008 letter from Paul Grandolf, M.D., Plaintiff's primary care physician, stated Plaintiff was hospitalized in April 1994 for "a severe closed-head injury, multiple leg fractures and numerous body injuries" (Tr. 368). The note further indicated that Plaintiff was not, and currently is not, capable of engaging in gainful employment (Tr. 368).

### C.    Vocational Expert Testimony

VE Elaine Tripi asked whether the customer service work in the bridal salon was considered substantial gainful activity (Tr. 388). ALJ Roshak responded that it was not and gave the Plaintiff's earnings record from 1991 to 2005 (Tr. 388). The VE stated that she considered Plaintiff's former work in a daycare and bridal salon not relevant (Tr. 388-389). The ALJ then posed the following question:

> "Assuming for the purposes of the hypothetical and giving full credibility to the [Plaintiff]'s testimony, considering her age, her education, and the other information that she's testified to, could she do her past work helping out her

-10-

mother?"

(Tr. 389). The VE found that based on the above assumptions, Plaintiff would not have been able to perform any substantially gainful work activity during the time period indicated (Tr. 389).

### D.    The ALJ's Decision

ALJ Roshak found that Plaintiff met the special insured status requirements for disability purposes from April 24, 1994 through June 30, 1994 (Tr. 30). In a Step Two determination, he found that Plaintiff's impairments for the relevant period "could not have been expected to either result in death or preclude her from engaging in any substantial gainful activity for a continuous period of not less than 12 months" (Tr. 33). He concluded that Plaintiff was not under a disability as defined in the Social Security Act at any time through June 30, 1994 (Tr. 33).

ALJ Roshak determined that Plaintiff's injuries from the motor vehicle accident healed without problems that would preclude substantial gainful activity and the hydrocephalus had existed prior to the accident and did not preclude substantial gainful activity (Tr. 32). The ALJ also found that Plaintiff's subsequent complications relating to the hydrocephalus, chronic abdominal pain, and debilitating depression and anxiety occurred years after her date last insured (Tr. 32). The ALJ relied on Dr. Mazhari's determination that surgical intervention was not warranted and that Plaintiff's hydrocephalus predated the accident (Tr. 31). The ALJ also cited Dr. Canady's diagnosis in "September 2004" that Plaintiff's hydrocephalus with Chiari malformation was "probably not related" to the accident and a

-11-

shunt placement in "December 2005" (Tr. 31).[6]  He also referred to medical files that Plaintiff's right leg fractures healed well, along with Plaintiff's ability to return to school, work at the bridal shop, and take driver's training to show no evidence of a medically determinable mental/emotional impairment during the pertinent period .  (Tr. 31, 32).

## STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence.  42 U.S.C. § 405(g); *Sherrill v. Secretary of Health & Human Services,* 757 F.2d 803, 804 (6th Cir. 1985).  Substantial evidence is more than a scintilla but less that a preponderance.  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)).  The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts."  *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986) (en banc).  In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight."  *Wages v. Secretary of Health & Human Services,* 755 F.2d 495, 497 (6th Cir. 1985).  The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ.  *Walker v. Secretary of Health & Human Services,* 884

---

[6]The ALJ erroneously referenced the incorrect years: 2004 should be 1994 and 2005 should be 1995.

F.2d 241, 245 (6th Cir. 1989).

## <u>FRAMEWORK FOR DISABILITY DETERMINATIONS</u>

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy. 20 C.F.R. § 416.920(a). The Plaintiff has the burden of proof as steps one through four, but the burden shifts to the Commissioner at step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir. 1984).

## <u>ANALYSIS</u>

Plaintiff contends that since April 1994, she has been disabled "due to closed head injury, headaches, brain surgeries, abdominal pain, broken legs, depression and anxiety." *Plaintiff's Brief,* 1-2; *Docket #10.* Plaintiff further asserts that the ALJ's finding, that Plaintiff's impairments could not have expected to preclude her from engaging in any substantially gainful activity for a continuous period of not less than 12 months, is not

-13-

supported by substantial evidence.  *Id.* at 5.

## A.    The ALJ's Step Two Determination

The ALJ's Step Two finding of the absence of severe impairments stands against the great weight of evidence and constitutes reversible error.  20 C.F.R § 416.921(a) defines a non-severe impairment which does not require inclusion at Step Two as one that does not "significantly limit [the] physical or mental ability to do basic work activities."  The same regulation defines "basic work activities" as "understanding, carrying out, and remembering simple instructions; use of judgement; responding appropriately to supervision, co-workers and usual work situations; and dealing with changes in a routine work setting."  *Id.*  "[T]he second stage severity inquiry, properly interpreted, serves the goal of administrative efficiency by allowing the Secretary to screen out totally groundless claims."  *Farris v. Secretary of HHS*, 773 F.2d 85, 89 (6th Cir. 1985).  An impairment can be considered "not severe...only if the impairment is a 'slight abnormality which has such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education and work experience.'"  *Id.* at 90 (*quoting Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984)).

The ALJ's Step Two determination is without record support.  The transcript indicates that Plaintiff's physicians opined repeatedly that she was incapable of any work.[7]

---

[7]The uncontradicted opinions of treating physicians are entitled to complete deference. *Jones v. Sec'y of Health & Human Servs.*, 945 F.2d 1365, 1370 (FN 7)((6th Cir. 1991).  In the presence of contradictory evidence, the ALJ must consider: "the length of...the relationship and the frequency of examination, the nature and extent of the

In finding that Plaintiff's hydrocephalus was not a disabling condition, the ALJ took Dr. Mazhari's statement that it predated the accident out of context. The ALJ's reliance on that single statement ignores the substance of the treating physicians' findings and further stands at odds with Mazhari's own acknowledgment that Plaintiff required surgical intervention in September of 1994, on the very heels of her accident (Tr. 127). Furthermore, Dr. Canady stated in September 1994, that Plaintiff "has hydrocephalus with Chiari malformation," further opining that "[i]t [was] probably not related to her accident [but] whether it was exacerbated by the accident or not is difficult to say." (Tr. 233).

The record contains additional evidence, apparently not considered by the ALJ, that supports the inference that Plaintiff's condition was either exacerbated by the accident or deteriorated within the insured period. First, the treating records on the date of the accident indicate that Plaintiff "lost consciousness for 20 minutes as a result of injury to the head" and suffered several lacerations on the forehead (Tr. 129). Secondly, on July 18, 1994, Dr. Canady noted that Plaintiff was likely to have been "progressive[ly] symptomatic" prior to the accident and was certainly "symptomatic" after the accident, evidenced by the recommendation for placement of a shunt (Tr. 238). Thirdly, Plaintiff underwent surgery in September 1994 for her Chiari malformation and in February of 1995, she began exhibiting difficulty with balance, "light headedness," and loss of recent memory, which required

---

treatment,...[the] supportability of the opinion, *consistency...with the record as a whole*, and the specialization of the treating source." *Wilson v. Comm'r of Social Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)(*citing* 20 C.F.R. §404.1527(d)(2))(emphasis added).

placement of a shunt (Tr. 226, 228-230). The fact that the shunt placement did not occur until February 1995 does not establish non-disability for a condition clearly arising *prior* to the expiration of the insured period. There is no evidence in the record that Plaintiff experienced any further injuries outside the insured period that would lead to such a rapid degradation of her condition.

Further, while the ALJ cited various portions of the medical files for the proposition that Plaintiff was not disabled, these citations, in large part, actually reflect a distortion of the record. The ALJ determined "that the injuries incurred from the April 24, 1994 motor vehicle accident healed without residuals" (Tr. 31). However, this determination is made from treating notes in April 1996, two years after Plaintiff's alleged onset of disability (Tr. 155). While the ALJ cited Plaintiff's ability to return to school, work at the bridal shop, and take driver's training (Tr. 32), Plaintiff's 1997 treating notes stated that Plaintiff "doesn't have the strength or endurance to return to school at this time," with the earliest indication of attempting school occurring in the same year (Tr. 267). The bridal store is also mentioned in the same note, but Plaintiff performed make-work tasks for therapeutic reasons, not substantial gainful employment (Tr. 267). Finally, Plaintiff did not begin driver's training until April 2005 (Tr. 354). Thus, all of the facts that the ALJ utilized in determining Plaintiff was not disabled occurred several years after the alleged disability date, and add little if anything to the question of whether Plaintiff was disabled during the 12 month period following the accident. Moreover, Dr. Canady opined that Plaintiff was "on bed rest for 1 1/2 years" following the accident (Tr. 219).

-16-

"Substantial evidence cannot be based on fragments of the record." *Laskowski v. Apfel*, 100 F.Supp.2d 474, 482 (E.D.Mich. 2000).   In this case, the ALJ's selective use of portions of the records to support non-disability, while ignoring overwhelming evidence to the contrary, amounts to a distortion of the record.   Accordingly, the case must be remanded for further analysis and reconsideration, pursuant to sentence four of § 405(g).

### B.     Evidence Submitted After the Administrative Decision

Along with her request for Appeals Council Review, Plaintiff submitted five additional exhibits (Tr. 367-371).   These records consist of a November 1994 newspaper photo of Plaintiff in a hospital bed located in her parent's living room, letters from treating physicians, and medical records which were not reviewed by the ALJ.   Ordinarily, new material is considered in the context of sentence six of § 405(g).   However, Plaintiff has not specifically asked for a sentence six remand.   Nevertheless, "under the plain language of § 405(g), the Court can properly grant a sentence six remand *sua sponte*, based on its finding that the post decision material is both new and material."   *Street v. Comm'r of Social Security*, 390 F.Supp.2d 630, 640 (E.D. Mich. 2005).   A sentence six remand is appropriate upon a showing that (1) there is new evidence that is material, and (2) there is good cause for not having presented this evidence at the earlier administrative proceeding. *Bass v. McMahone*, 499 F.3d 506, 513 (6th Cir. 2007).   Accordingly, this Court "may consider the additional evidence only for purposes of determining whether remand is appropriate under the sixth sentence of 42 U.S.C. §405(g)." *Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993).   Where the Appeals Council denies a claimant's request for a review of her application based on new material,

-17-

"the district court cannot consider that new evidence in deciding whether to uphold, modify, or reverse the ALJ's decision under sentence four. *Id.* at 695-96.

In order for Plaintiff to satisfy her burden of proof as to materiality, she must demonstrate that there is a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence. *Sizemore v. Sec'y of Health & Human Servs.*, 865 F.2d 709, 711 (6ᵗʰ Cir. 1988). The records Plaintiff submitted to the Appeals Council are clearly material under this standard.

The October 2007 letter from Steven D. Ham, D.O., indicates that Plaintiff was "unable to walk and had severe impairment" in April, May, and June of 1994 (Tr. 370). Most significantly, the November 1995 letter from C. Pontillo, office manager for Dr. Simaika, stated that Plaintiff was "*unable to ambulate without assistance* until October of 1995," due to injuries sustained in the motor vehicle accident in April 1994 (Tr. 371) (emphasis added). The letter further reported that Plaintiff required "around the clock" assistance until November 1995, when assistance was only needed for 4 hours per day (Tr. 371).

These records stand at odds with the ALJ's determination that Plaintiff was not disabled during the 12 month period and present a reasonable probability that a different disposition of the disability claim could have been reached.

However, the Plaintiff has not shown "good cause" for not having proffered these records at the original administrative hearing.

"In order to show good cause the complainant must give a valid reason for [her] failure to obtain evidence prior to the hearing." *Oliver v. Sec'y of Health & Human Servs.*, 804 F.2d

-18-

964, 966 (6th Cir. 1986)(*citing Willis v. Sec'y of Health and Human Servs.*, 727 F.2d 551, 554).  Plaintiff gives no reason in the record for not obtaining the evidence before the hearing. Furthermore, Plaintiff's claim for DIB was filed protectively nearly 10 years after the alleged disability, giving more than sufficient time for Plaintiff to procure the records. Additionally, Plaintiff's counsel did not request that the record to be held open for submission of additional evidence during the administrative hearing.  Therefore, because Plaintiff has not shown good cause, a sentence six remand is not appropriate.

However, because this case must be remanded on independent grounds under sentence four, *see* section A, supra,[8] the ALJ may properly consider this material on remand, even though Plaintiff has not shown good cause under sentence six.  In *Faucher v. Secretary of Health and Human Services*, 17 F.3d 171 (6th Cir. 1994), the plaintiff requested an award of benefits or in the alternative, a remand for additional proceedings under both sentence four and sentence six.  The district court found that the plaintiff had not met the "good cause" requirement for a sentence six remand, but awarded benefits.  On appeal, the Sixth Circuit reversed the award of benefits, but remanded for proceedings under sentence four.  However, *Faucher* held that when an ALJ commits an error that results in a sentence four remand, the ALJ can consider additional evidence, even though the plaintiff has not otherwise met the requirements of sentence six.  *Faucher* rejected the contention that only a sentence six remand would permit the taking of additional evidence:

---

[8] Of course, the newly presented material has not been considered in recommending the sentence four remand.

-19-

"To conclude, remands under both sentence four and sentence six of § 405(g) can involve the taking of additional evidence. Under sentence six, a district court, before making a final judgment, may order the Secretary to consider additional evidence because a party presents material evidence to the court that was not previously available.

"Under sentence four, the court makes a final judgment, affirming, reversing, or modifying the Secretary's decision and *may order the Secretary to consider additional evidence on remand to remedy a defect in the original proceedings*, a defect which caused the Secretary's misapplication of the regulations in the first place" (emphasis added). 17 F.3d at 175.

In this case, therefore, *Faucher* provides a remedy whereby the case is remanded under sentence four, with a directive to the Secretary to consider the additional evidence that Plaintiff has submitted.

## CONCLUSION

For these reasons, I recommend that Defendant's Motion for Summary Judgment be DENIED and that Plaintiff's Motion for Summary Judgment GRANTED.  I further recommend that the case be remanded under sentence four of 42 U.S.C. § 405(g), directing the Secretary to consider the new evidence that was submitted to the Appeals Council and to this Court.

Any objections to this Report and Recommendation must be filed within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505 (6th Cir.  1991); *United States v. Walters*, 638 F.2d 947 (6th Cir.  1981).  Filing of objections which raise some issues but fail to raise others with

-20-

specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.


                              s/R. Steven Whalen
                              UNITED STATES MAGISTRATE JUDGE

Dated:  July 20, 2009

                    CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served on the attorneys and/or parties of record by electronic means or U.S. Mail on July 20, 2009.

                              s/Susan Jefferson
                              Case Manager

-21-